FILED

July 1 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0113

DA 14-0113

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 192

MASTERS GROUP INTERNATIONAL, INC.,

        Third-Party Plaintiff and Appellee,

    v.

COMERICA BANK,

        Third-Party Defendant and Appellant,

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DV 2011-372
Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        James H. Goetz (argued), Goetz, Baldwin, & Geddes, P.C., Bozeman, Montana

        Mark L. Stermitz, Matthew A. Baldassin, Crowley Fleck PLLP, Missoula, Montana

        Jane Derse Quasarano, Thomas J. Tallerico, Jeffrey G. Raphelson, Bodman PC, Detroit, Michigan

    For Appellee:

        Timothy B. Strauch, Strauch Law Firm, PLLC, Missoula, Montana

        Ward E. "Mick" Taleff (argued), Taleff Law Office, P.C., Great Falls, Montana

    For Intervenor State of Montana:

        Timothy C. Fox, Montana Attorney General, Mark Mattioli (argued), Chief Deputy Attorney General, Jon Bennion, Deputy Attorney General, Helena, Montana

For Amici Curiae:

J. Daniel Hoven, Browning, Kaleczyc, Berry & Hoven, P.C., Helena, Montana (for Motor Carriers of Montana and Montana Health Care Providers)

Charles W. Hingle, Michael P. Manning, Steven T. Small, Holland & Hart LLP, Billings, Montana (for American Bankers Association)

Lawrence A. Anderson (argued), Attorney at Law, P.C., Great Falls, Montana (for Amicus Montana Trial Lawyers Association)

Argued: September 26, 2014
Submitted: October 29, 2014
Decided: July 1, 2015

Filed:

Clerk

2

Justice Beth Baker delivered the Opinion of the Court.

¶1     Comerica Bank appeals a jury verdict and judgment rendered in favor of Masters Group International, Inc. in the Second Judicial District Court, Silver Bow County.  We restate the determinative issues on appeal as follows:

1. *Whether the District Court abused its discretion by denying Comerica's severance motion;*

2. *Whether the District Court erred in applying Montana law despite the existence of a contractual choice-of-law provision;*

3. *Whether the District Court erred in not deciding issues of contract formation as a matter of law;*

4. *Whether the District Court abused its discretion by allowing TARP evidence to be presented to the jury.*

¶2     We affirm in part, reverse in part, and remand for a new trial.

### FACTUAL AND PROCEDURAL BACKGROUND

¶3     In 2004 and 2005, a group of executives and investors who would eventually form Masters Group International, Inc., a Delaware corporation, entered into discussions with the Office of the Governor of the State of Montana about establishing an international office products assembly and distribution facility in Butte, Montana.  Masters planned to acquire a United Kingdom office products business and expand its operations into North America, with Butte serving as the company's world headquarters.  Masters sought to obtain State financial and technical assistance for developing this project.  The negotiations resulted in a non-binding Letter of Understanding between Masters and the Governor's Office of Economic Opportunity signed in January 2006.

3

¶4     As early as January 2006, Masters was in communication with Comerica Bank, a financial services company incorporated under the laws of the State of Delaware with headquarters in Detroit, Michigan,[1] regarding a loan to facilitate the purchase of the office products business and to establish a headquarters in Butte.  On July 11, 2006, Masters executed a loan agreement and promissory note (Agreement) with Comerica for $9 million, subject to repayment on or before July 11, 2008.  Comerica's law firm, located in Detroit, Michigan, and Masters' law firms, located in Chicago, Illinois, negotiated the transaction.  The Agreement financed the acquisition of the UK office products business and was intended to support the expansion of operations into North America.  The Agreement did not contain any provision addressing its purpose, potential maturity extensions, or the availability of additional credit.  The parties executed the Agreement in various locations, including Michigan, Illinois, Virginia, the District of Columbia, and the United Kingdom.

¶5     The Agreement provided that it would "be governed by and construed and enforced in accordance with the laws of the State of Michigan."  As collateral, Masters offered its inventory, equipment, and accounts receivable.  Additionally, private investor Larry Pratt and the Larry F. Pratt Living Trust guaranteed the loan by pledging $9 million worth of marketable securities.

¶6     In October 2006, Masters and the Consolidated City and County of Butte-Silver Bow signed a Memorandum of Understanding that contemplated the development of an

---

[1] In 2007, Comerica relocated its headquarters from Detroit to Dallas, Texas.

4

industrial warehousing and manufacturing facility within the Tax Increment Financing Industrial District No. 2 (TIFID District) in Butte. The Memorandum of Understanding included a proposed $4.5 million financial package from the TIFID District.

¶7 On December 6, 2006, Masters entered into a separate loan agreement (BLDC Agreement) with the Butte Local Development Corporation (BLDC), a non-profit corporation focused on economic development in the Butte-Silver Bow area. Under the BLDC Agreement, BLDC loaned Masters $200,000 as working capital for start-up expenditures related to Masters' proposed distribution center in the TIFID District. The BLDC Agreement stated that the loan would accrue interest at six percent for a period of two years during which time no payments would be due. After the two-year period, the loan balance would then be recapitalized and amortized over a period of eighty-four months beginning on June 6, 2008. Masters granted BLDC a security interest in its business assets, subordinate to Comerica's existing security interest.

¶8 Throughout the first half of 2007, Masters moved forward with its development plans in Butte by obtaining a geotechnical report, a transportation and feasibility analysis, and building design specifications. By the fall of 2007, however, it became clear that the proposed Butte facility would not be completed in time to meet the demands of Masters' customers, and that there was no feasible alternative location in Butte for such a facility. Masters therefore leased warehouse space in Reno, Nevada. In light of the situation, BLDC deauthorized the TIFID District financial package.

*Amendments to the Agreement*

¶9    On October 29, 2007, Comerica amended its Agreement with Masters to include a $500,000 increase in the principal amount of the loan.  The Agreement was amended again on December 19, 2007, to include another $500,000 increase, raising the loan total to $10 million.  To obtain these increases, Masters provided Comerica with a $500,000 letter of credit from Matthew and Lilian Nolan and the personal pledge of Dr. Michael Vlahos for $500,000 in control accounts at Wachovia Bank.  The October 2007 and December 2007 amendments were evinced by a Promissory Note, an Amended and Restated Letter Agreement, and an Amended and Restated Guaranty— each of which included a provision stipulating to the application of Michigan law.  Neither amendment altered the Agreement's original July 11, 2008 maturity date.

¶10    During the early months of 2008, Pratt's marketable securities, which established the borrowing base for the loan, decreased in value.  Comerica sent Masters a Notice of Default and Reservation of Rights letter on April 28, 2008, explaining that Masters was in default because it was out of compliance with the borrowing formula set forth in the Agreement as amended, given the significant decrease in the value of Pratt's securities. The letter stated that Comerica was under no obligation to advance funds, and that any discretionary advances would "not constitute a waiver of any defaults or any of [Comerica]'s rights and remedies or an offer of forbearance, and will not constitute [Comerica]'s agreement or commitment to make additional advances."  Additionally, the letter stated that Comerica anticipated discussions addressing the default that "may take

6

place in the future," and that any future agreement must be reached on all issues, reduced to writing, and signed by Masters, its guarantors, and Comerica.

¶11 In July 2008, the parties discussed a renewal and further loan increases, but did not commit their negotiations to writing. The loan under the Agreement matured on July 11, 2008, without repayment by Masters. Comerica indicated to Masters that it could not address the renewal and loan increases until August 2008 due to staff vacations.

¶12 On July 30, 2008, Comerica sent Masters another Notice of Default and Reservation of Rights, explaining that it would not consider requests for an extension of the maturity of the loan or other modifications until Masters complied with the borrowing formula.

¶13 Two days later, on August 1, 2008, Comerica sent Masters a letter stating that Comerica was declining to extend the maturity of the loan and was forbearing "only from day to day." In addition, Comerica wrote that unless Masters paid the full amount owed by August 8, 2008, Comerica would exercise its rights under the Agreement. The letter noted that Comerica's failure to immediately exercise its rights and remedies "shall not be construed as a waiver or modification of those rights or an offer of forbearance." Comerica again anticipated discussions to address the default that "may take place in the future" and specified that any agreement must be reached on all issues, reduced to writing, and signed by Masters, its guarantors, and Comerica.

¶14 Masters responded by expressing "surprise[]" at Comerica's "drastic move," stating that Comerica had given no previous indication of its intent to sever its two-year

relationship with Masters. Masters requested, at minimum, a reasonable amount of time to find a replacement lender once the borrowing formula was remedied. In response, Comerica referenced Pratt's securities as being below the necessary amount, and a July 25, 2008 e-mail from Pratt indicating his initial reluctance to rectify the borrowing formula shortfall. Comerica suggested that it was willing to consider a forbearance agreement to provide Masters time to find replacement financing, dependent on Masters reestablishing compliance with the formula. In the ensuing days, Pratt attempted to adjust his security accounts to ameliorate the borrowing base deficiency, but discovered that Comerica had taken exclusive control of his account, thus preventing him from making any adjustments.

¶15 Comerica agreed to amend the Agreement a third time on August 27, 2008, providing Masters with another $500,000 and extending the maturity date of the loan (now totaling $10.5 million) to November 1, 2008. As before, the amendment was evinced by a Promissory Note, a Third Amended and Restated Letter Agreement, a Third Amended and Restated Guaranty, and two security agreements—each of which included a provision stipulating to the application of Michigan law.

¶16 Through the autumn of 2008, Masters was aware that its financial position could trigger a default because it remained out of compliance with the borrowing formula and was unable to cover existing payment obligations. Despite its efforts, Masters had yet to secure an alternate financing option.

¶17    On November 25, 2008, Comerica sent Masters another notice that Masters was out of compliance with the borrowing formula. Comerica asserted it was "forbearing only from day to day" and again warned Masters that unless the loan was paid in full by December 5, 2008, Comerica would exercise its rights under the Agreement. Comerica declined to extend the maturity of the loan, noting that its failure to exercise its rights immediately "shall not be construed as a waiver or modification of those rights or an offer of forbearance." The letter further stated that Comerica "anticipates that discussions addressing the Liabilities may take place in the future"; however, Comerica would not be bound "unless or until an agreement is reached on all issues and . . . reduced to writing and signed by" Masters, its guarantors, and Comerica.

¶18    Masters continued to seek alternative financing options. Wells Fargo provided Masters with an initial term sheet on December 2, 2008, which was disclosed to Comerica the following day. After further consultations between Wells Fargo and Masters, Wells Fargo provided a modified term sheet on December 17, 2008, which was also disclosed to Comerica. The term sheets contemplated paying off Masters' existing line of credit with Comerica and financing Masters' ongoing working capital needs by extending $13 million. Both term sheets were intended for discussion purposes only, subject to further due diligence and credit approval by Wells Fargo.

*The Forbearance Agreement*

¶19    On December 17, 2008, Comerica sent Masters an offer to forbear until February 16, 2009 (Forbearance Agreement).  The Forbearance Agreement contained a Michigan choice-of-law clause and the signature of a Comerica representative.

¶20    The Forbearance Agreement stated that Masters was in default for failing to repay the loan from Comerica and for being out of compliance with the borrowing formula.  It provided that Masters acknowledged that Comerica was "under no obligation to advance funds or extend credit to [Masters]," and that Comerica did not "intend to make further advances."  It further provided:  "Subject to timely, written acceptance by Borrower and Guarantors of the following conditions, Bank is willing to forbear until February 16, 2009, subject to earlier termination as provided below, from further action to collect the Liabilities."

¶21    The agreement imposed numerous significant conditions.  Masters agreed to deposit $56,204 into Comerica's account, an amount equivalent to the estimated aggregate interest payments due from January 1, 2009, to February 16, 2009.  On or before December 29, 2008, Vlahos (or another investor) would inject $250,000 into a "general account" to cover interest payments due through December 31, 2008, Comerica's legal expenses, and other fees, including the closing fee.  Also on or before December 29, 2008, Vlahos was to liquidate his financial assets in his Wachovia securities account, execute a security agreement with Comerica on these assets, and ensure that the total transfer amounted to $500,000 by the close of business on

10

December 29, 2008. On or before December 31, 2008, Masters would pay a $52,500 closing fee. On or before January 16, 2009, Pratt was to deposit cash in a Comerica account in order to cover the shortfalls in his $9 million obligation.

¶22 Comerica reserved the right to exercise its rights and remedies under the Forbearance Agreement, and a failure to exercise those rights and remedies was not to "be construed as a waiver or modification of those rights or an offer of forbearance." The Forbearance Agreement stated that Comerica would not be bound, absent an express written waiver by Comerica, until an agreement was met on all issues, "reduced to writing and signed by" Masters, its guarantors, and Comerica. Masters agreed to use its best efforts to procure alternative financing and provide written confirmation of the financing arrangement on or before January 23, 2009. Acceptance of the Forbearance Agreement required that "Borrower and Guarantors . . . properly execute this Agreement and hand deliver [the] same to the undersigned by no later than 12:00 (noon) on December 19, 2008."

¶23 Masters signed the Forbearance Agreement on December 19, 2008. On December 22, 2008, a Comerica executive acknowledged receipt of the signed agreement and stated he was "look[ing] forward to the rest of the signatures." After transferring more than $8 million into a Comerica money market account, Guarantor Pratt signed the agreement on December 21, 2008. As Comerica was aware, Vlahos was out of the country and unavailable, so he had not yet signed the Forbearance Agreement.

11

¶24 On December 29, 2008, Comerica sent entitlement orders to Wachovia Securities instructing it to liquidate Vlahos's assets and wire the cash to Comerica. With regard to Vlahos's signature, Comerica sent an e-mail to Masters on December 30, 2008, stating, "[W]e need the attached security agreement signed and the Forbearance signed."

*The Offset*

¶25 On Wednesday, December 31, 2008, at approximately 4:50 p.m. and without notice, Comerica initiated an offset of Masters' and Guarantors' cash accounts and other liquid assets totaling nearly $10.5 million. Neither Masters nor the Guarantors were alerted that the offset would occur. This seizure of assets resulted in a recall of Masters' payroll checks and payments to suppliers, and precipitated the collapse of the company. Although Comerica formed a Special Handling Group at the end of 2008 intended to help customers who were undergoing various levels of financial distress, the group did not commence operations until the first quarter of 2009, by which time Masters' accounts already had been offset.

*The Proceedings*

¶26 On October 4, 2011, BLDC filed a complaint against Masters in the Second Judicial District of Montana alleging that Masters had failed to pay its obligations under the BLDC Agreement as modified.[2] BLDC explained that it had elected to accelerate

---

[2] BLDC and Masters had agreed to modify the BLDC Agreement on May 15, 2008, to provide for certain interest-only payments and deferral of payment until December 6, 2008. The initial BLDC Agreement provided that amortized payments were to begin on June 6, 2008. The parties modified the BLDC Agreement again on January 21, 2010, to defer loan payments until July 6, 2010.

payments and was suing Masters for the full $200,000 plus interest, penalties, and costs. On November 16, 2011, Masters filed an answer to the BLDC complaint. Masters also filed a third-party complaint against Comerica, alleging that Comerica breached the Forbearance Agreement by sweeping Masters' and Guarantors' accounts without notice after contractually binding itself to forbear until February 16, 2009. In its complaint against Comerica, Masters also alleged breach of the implied covenant of good faith and fair dealing, constructive fraud, deceit, wrongful offset, and interference with and loss of prospective economic opportunity, and requested punitive damages.

*The Standstill Agreement*

¶27 On November 30, 2011, BLDC and Masters entered into an agreement (Standstill Agreement) whereby Masters acknowledged its indebtedness to BLDC "in an amount to be determined," and BLDC recognized that "Masters lack[ed] the ability to satisfy its obligation to BLDC other than by successful recovery against Comerica." Therefore, BLDC agreed "to cooperate with Masters in the litigation and support it in connection with retention of the litigation in Montana district court and in Montana." The parties also agreed that neither would settle or assign any claim against each other or Comerica without the other's written consent.

¶28 On March 21, 2012, Comerica filed a Motion to Sever Third Party Complaint, seeking to sever Masters' claims against it from the litigation between BLDC-Masters. The District Court never ruled on Comerica's motion to sever and it was deemed denied on May 7, 2012, pursuant to Rule 19 of the Second Judicial District Court Rules.

13

¶29     On September 17, 2013, Comerica moved for partial summary judgment on the application of Michigan law. The District Court denied Comerica's motion, determining that Montana law should apply because Comerica had not affirmatively raised the choice-of-law issue in a timely manner. The District Court also determined that Masters could reference at trial Comerica's receipt of federal Troubled Asset Relief Program (TARP) funds following the "government bailout" of Comerica, and the availability of such funds for troubled borrowers.[3] The District Court also issued an order prohibiting Comerica from discussing the Standstill Agreement in front of the jury.

¶30     Trial commenced on January 6, 2014. At the conclusion of the evidence and argument, the case was submitted to the jury on all counts, tort and contract, with a general verdict form. On January 17, 2014, a unanimous jury found Masters liable to BLDC for $275,251.09, covering the original loan principal, interest, costs and attorney fees. The jury found Comerica liable to Masters for a total of $52,037,593, which the jury allocated as follows: (1) "Principal and interest on funds wrongfully offset: $5,433,910"; (2) "Lost profits or other future gain: $19,603,683"; (3) "Other consequential damages: $16,500,000"; and (4) "punitive damages in the amount of $10,500,000."

---

[3] This program, passed by Congress in 2008 through the Emergency Economic Stabilization Act, authorized the U.S. Department of the Treasury to purchase "troubled assets from any financial institution," 12 U.S.C. § 5212, or "guarantee troubled assets," 12 U.S.C. § 5211, for the purpose of "restor[ing] liquidity and stability to the financial system" during the 2008 economic crisis, 12 U.S.C. § 5201. *See also Thomas v. JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 786 (S.D.N.Y. 2011) ("In response to the financial crisis Congress enacted the Emergency Economic Stabilization Act of 2008, which in turn authorized the Secretary of the Treasury to establish [TARP].") (citing 12 U.S.C. §§ 5201-5261).

¶31 Following trial, Comerica filed Rule 50 and Rule 59 motions renewing many of its earlier objections, which the District Court denied. Comerica appeals.

## STANDARDS OF REVIEW

¶32 A court "may order a separate trial of one or more separate issues" to further "convenience, to avoid prejudice, or to expedite and economize." M. R. Civ. P. 42(b). A district court's decision whether to sever is reviewed for an abuse of discretion. *Mont. Coal. for Stream Access v. Hildreth*, 211 Mont. 29, 40, 684 P.2d 1088, 1093 (1984) (noting a district court's discretionary authority to sever under M. R. Civ. P. 14), *overruled on other grounds*, *Gray v. Billings*, 213 Mont. 6, 13, 689 P.2d 268, 272 (1984); *State ex rel. Fitzgerald v. Dist. Court*, 217 Mont. 106, 116, 703 P.2d 148, 155 (1985) (noting that M. R. Civ. P. 42(b) provides "broad discretion to a district court in the handling of trial procedures").

¶33 This Court reviews issues of law—including interpretation of a contract, decisions on choice of law, and summary judgment rulings—de novo. *Tidyman's Mgmt. Servs. v. Davis*, 2014 MT 205, ¶ 13, 376 Mont. 80, 330 P.3d 1139. Procedural trial considerations are determined under the law of the forum. *State v. Lynch*, 1998 MT 308, ¶ 27, 292 Mont. 144, 969 P.2d 920. Generally speaking, courts determine substantive questions under the law chosen by the parties in a contract. *Modroo v. Nationwide Mut. Fire Ins. Co.*, 2008 MT 275, ¶ 54, 345 Mont. 262, 191 P.3d 389.

¶34 We review a district court's ruling on a motion for summary judgment de novo, applying the criteria set forth in M. R. Civ. P. 56. *Dulaney v. State Farm Fire & Cas.*

*Ins. Co.*, 2014 MT 127, ¶ 8, 375 Mont. 117, 324 P.3d 1211. Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3); *Dulaney*, ¶ 8.

¶35 District courts have broad discretion to control the admission of evidence at trial. *Seltzer v. Morton*, 2007 MT 62, ¶ 65, 336 Mont. 225, 154 P.3d 561. Evidentiary rulings are reviewed for an abuse of discretion. *Seltzer*, ¶ 65. A district court abuses its discretion when it "act[s] arbitrarily without conscientious judgment," or it "exceed[s] the bounds of reason." *Seltzer*, ¶ 65 (citing *Lopez v. Josephson*, 2001 MT 133, ¶ 14, 305 Mont. 446, 30 P.3d 326). If a district court abuses its discretion in an evidentiary ruling, "[w]e must then determine whether the demonstrated abuse of discretion constitutes a reversible error." *Seltzer*, ¶ 65 (citing *In re A.N.*, 2000 MT 35, ¶ 55, 298 Mont. 237, 995 P.2d 427). Reversible error occurs "[w]here the impact of clearly inadmissible evidence is conceivably outcome-determinative," and "there is a reasonable possibility the inadmissible evidence might have contributed to the verdict." *Boude v. Union Pac. R.R. Co.*, 2012 MT 98, ¶ 21, 365 Mont. 32, 277 P.3d 1221 (citation omitted).

## DISCUSSION

¶36 *Issue 1: Whether the District Court abused its discretion by denying Comerica's severance motion.*

¶37 Comerica asserts that the District Court abused its discretion by failing to rule on its severance motion. In its March 21, 2012 Motion to Sever Third Party Complaint, Comerica urged the District Court to sever the case into two separate trials with separate

16

cause numbers (*BLDC v. Masters* and *Masters v. Comerica*). Citing M. R. Civ. P. 14 and 42(b), Comerica contended that simultaneous litigation of the two cases would frustrate efficiency and economy, and otherwise be unnecessarily prejudicial to the parties. On May 7, 2012, Comerica's severance motion was deemed denied pursuant to Rule 19 of the Second Judicial District Court Rules, as the District Court never ruled on it. *See* Sec. Jud. Dist. Ct. Rules Butte-Silverbow Cty., R. 19 (1997) (stating that a motion is deemed denied if it "is not ruled upon within forty-five (45) days of the date the motion was filed").

¶38 On appeal, Comerica argues that the District Court's failure to rule on its severance motion constitutes an abuse of discretion and reversible error, asserting that the allegedly unrelated cases should not have been tried together and that the court's inaction ultimately invited an improper appeal to local prejudice during trial.

¶39 As noted, a district court's decision concerning severance is reviewed for an abuse of discretion. *See Hildreth*, 211 Mont. at 40, 684 P.2d at 1093. The parties cite no case in which this Court has held that a district court's failure to rule on a civil motion per se equates to an abuse of discretion, and we decline to so hold now. We therefore must determine whether the District Court abused its discretion with its de facto denial of the severance motion in light of the severance motion's merits.

¶40 In its March 21, 2012 motion, Comerica advanced general concerns as the basis for severance in the early stages of the litigation. Now—on appeal—Comerica claims that the failure to sever resulted in an unseemly appeal to local prejudice during the trial.

17

Comerica made no local prejudice argument when it initially sought severance. This Court does not consider arguments raised for the first time on appeal. *Mountain W. Bank, N.A. v. Glacier Kitchens, Inc.*, 2012 MT 132, ¶ 13, 365 Mont. 276, 281 P.3d 600. Moreover, in considering whether a ruling constitutes an abuse of discretion, we look to the situation that existed at the time the motion was made and the court ruled; we do not employ hindsight, which is what Comerica is asking us to do here. Given the circumstances that existed and the arguments presented at the time the severance motion was made, we conclude that the District Court did not abuse its broad discretion when it implicitly denied the severance motion.

¶41 *Issue 2: Whether the District Court erred in applying Montana law despite the existence of a contractual choice-of-law provision.*

¶42 Comerica challenges the District Court's denial of its motion to apply Michigan law and the court's application of Montana law to the claims and defenses of the parties. In its December 24, 2013 pre-trial order, the District Court denied Comerica's September 17, 2013 Motion for Partial Summary Judgment on the choice-of-law issue, declaring the motion untimely. The court explained that from the time Masters' Third-Party Complaint was filed on November 16, 2011, all proceedings in District Court had been conducted under the authority of Montana law, including a multitude of orders throughout the two years since the case was filed. Citing M. R. Civ. P. 12(b)(6), 8(c), and 16, the court stated that the Montana Rules of Civil Procedure "implore the parties to raise issues in a way that facilitates a just and speedy disposition of the case, and those matters should be raised early to avoid prejudice." The District Court concluded that by

failing to affirmatively raise choice-of-law issues early in the proceedings, Comerica waived its argument that Michigan law should control the proceedings.

¶43 In addition to determining that Comerica waived its right to assert a choice-of-law theory, the court concluded that contract and tort disputes in Montana require the application of the "most significant relationship" approach found in the Restatement (Second) of Conflict of Laws, §§ 187 and 188 (1971). Under this approach, the court determined that the factors weighed in favor of applying Montana law.

¶44 On appeal Comerica argues that the court's failure to adhere to Montana's precedent of promoting contracting parties' rights to choose governing law amounts to legal error, citing *Tenas v. Progressive Preferred Ins. Co.*, 2008 MT 393, ¶¶ 30-32, 347 Mont. 133, 197 P.3d 990. As to the District Court's declaring the motion untimely, Comerica contends that the choice-of-law argument was not waived, as Comerica had in fact raised the choice-of-law issue in prior pleadings, and then filed its motion well before the November 5, 2013 motion deadline. Comerica also argues that the court erred in attaching significance to Comerica's invocation of Montana law in its previous motions, noting that all of its previous motions were procedural in nature and therefore necessarily required the application of Montana law. Finally, Comerica argues that even under the court's "most significant relationship" approach, Michigan law still should apply.

¶45 Masters counters that choice of law arguably is an affirmative defense under M. R. Civ. P. 8(c), and therefore must have been raised in Comerica's answer to the Third-Party

19

Complaint. Even if choice of law is not treated as an affirmative defense, Masters asserts that the District Court correctly concluded that choice-of-law must be pleaded "early" to avoid prejudice, and that raising the issue nearly two years after the lawsuit was filed was simply too late. Masters also suggests that Comerica failed to preserve the choice-of-law issue when it offered Montana jury instructions on all claims.[4]

*Timeliness of the Request to Apply Michigan Law*

¶46 At the outset, we recognize that Montana courts have not squarely addressed whether choice of law is an affirmative defense within the ambit of Rule 8(c). Although this Court has determined that certain defenses not listed in Rule 8(c) constitute matters of avoidance or an affirmative defense that must be raised in an answer,[5] we decline to do likewise here with respect to choice of law.

¶47 M. R. Civ. P. 8(c) enumerates a non-exhaustive list of common affirmative defenses and includes a residuary clause "and any other matter constituting an avoidance or affirmative defense." *Burns v. Cash Constr. Lien Bond*, 2000 MT 233, ¶ 28, 301 Mont. 304, 8 P.3d 795 (stating that M. R. Civ. P. Rule 8(c)'s "list of affirmative defenses

---

[4] We reject this last argument out of hand. Comerica expressly preserved the choice-of-law issue in footnote one of its Proposed Jury Instructions by stating, "Comerica is not waiving its position that Michigan law applies to all aspects of this cause."

[5] *See, e.g.*, *Ammondson v. Nw. Corp.*, 2009 MT 331, ¶ 57, 353 Mont. 28, 220 P.3d 1 (holding "that advice-of-counsel, when used as an affirmative defense, must be pled in accordance with M. R. Civ. P. 8(c)"); *Orr v. State*, 2004 MT 354, ¶ 55, 324 Mont. 391, 106 P.3d 100 ("Immunity is a matter of avoidance, an affirmative defense."); *Brown v. Ehlert*, 255 Mont. 140, 146, 841 P.2d 510, 514 (1992) ("We conclude that Workers' Compensation exclusivity and co-employee immunity are matters of avoidance which, pursuant to Rule 8(c), M. R. Civ. P., must be pleaded affirmatively.").

is not an exhaustive list"). "The essence of [an] affirmative defense[] is to concede that while the plaintiff otherwise may have a good cause of action, the cause of action no longer exists because some statute or rule permits [the] defendant to avoid liability for the acts alleged." *Brown v. Ehlert*, 255 Mont. 140, 146, 841 P.2d 510, 514 (1992). We consistently have found that "[a]n affirmative defense is generally waived if not set forth affirmatively." *Nitzel v. Wickman*, 283 Mont. 304, 312, 940 P.2d 451, 456 (1997) (listing cases).

¶48 This Court has observed that:

> The rationale for requiring that these defenses be affirmatively pleaded is simple: the same *principles of fairness and notice* which require a plaintiff to set forth the basis of the claim require a defendant to shoulder a corresponding duty to set out not merely general denials as appropriate, but also those specific defenses not raised by general denials by which a defendant seeks to avoid liability, rather than merely to controvert [a] plaintiff's factual allegations.

*Ammondson v. Nw. Corp.*, 2009 MT 331, ¶ 55, 353 Mont. 28, 220 P.3d 1 (quoting *Brown*, 255 Mont. at 146, 841 P.2d at 514) (emphasis removed and added); *Weaver v. State*, 2013 MT 247, ¶ 35, 371 Mont. 476, 310 P.3d 495 (citing *Ammondson*, ¶ 55, and stating that M. R. Civ. P. 8(c) "concerns the underlying principles of 'fairness and notice'"). In *Burns*, this Court stated:

> [I]n determining what defenses other than those listed in Rule 8(c) must be pleaded affirmatively, resort often must be had to *considerations of policy, fairness, and in some cases, probability. . . .* "*Fairness*" should probably be viewed as a shorthand expression reflecting the judgment that all or most of the relevant information on a particular element of a claim is within the control of one party or that one party has a unique nexus with the issue in question and therefore that party should bear the burden of affirmatively raising the matter. . . . Another highly relevant consideration is *whether*

21

*plaintiff will be taken by surprise* by the assertion at trial of a defense not pleaded affirmatively by defendant.

*Burns*, ¶ 30 (citing 5 Wright & Miller, Federal Practice and Procedure: Civil 2d § 1271 (1990)) (emphasis added).

¶49 Thus, to determine whether a particular defense must be affirmatively pleaded under Rule 8(c), we look to considerations of notice, fairness, and surprise. *See Ammondson*, ¶ 55; *Burns*, ¶ 30. In this connection, we note that Masters was on full notice that each contract it negotiated with Comerica contained a Michigan choice-of-law provision. While, as the District Court noted, it is true that Comerica did not file a dispositive choice-of-law motion until fairly late in the proceedings, it is undisputed that Comerica raised the assertion in earlier pleadings served upon Masters, including Comerica's Motion to Sever Third Party Complaint and Comerica's Reply in Support of Motion for Protective Order. Masters cannot fairly argue that it was taken by surprise by Comerica's motion to apply Michigan law.

¶50 In its order rejecting Comerica's motion to apply Michigan law, the District Court did not declare that choice of law constituted an affirmative defense. Rather, it concluded that Comerica's motion was untimely and that by failing to raise the choice-of-law issue earlier in the proceedings, Comerica waived its argument that Michigan law should control the case.

¶51 While we afford the District Court broad discretion in controlling the course of litigation, *see Stevenson v. Felco Indust., Inc.*, 2009 MT 299, ¶ 32, 352 Mont. 303, 216 P.3d 763, we cannot uphold the District Court's ruling that Comerica's motion was

untimely when the motion was filed well before the deadline the court itself imposed for the filing of pretrial motions. The court's Second Scheduling Order, entered on January 30, 2013, stated that all motions must be filed at least twenty days before the November 25, 2013 Final Pretrial Conference. Comerica filed its Motion for Partial Summary Judgment with respect to the application of Michigan law on September 17, 2013, forty-nine days before the court's motion deadline.

¶52    As we noted in *Stevenson*, "[t]he purpose of a scheduling order is to instruct the parties to complete certain pretrial activities such as discovery and filing pretrial motions by a specific date." *Stevenson*, ¶ 32. Comerica filed its pretrial motion on choice-of-law before the specified date. We therefore reject the District Court's conclusion that Comerica's motion for the application of Michigan law was untimely filed. We next turn to whether the Michigan choice-of-law provision has substantive application to these proceedings.

*Effectiveness of the Choice-of-Law Provision*

¶53    Comerica asserts that the District Court committed legal error by neglecting to adhere to Montana's choice-of-law precedents. The District Court concluded, in applying Restatement (Second) of Conflict of Laws §§ 187 and 188, that the "most significant relationship" approach necessitated the application of Montana law to both the contract and tort disputes in this case, emphasizing that Comerica's actions prevented Masters from building its facility, conducting business, and performing contractual duties

23

in Montana. The court also noted that the injury and economic impact occurred in Montana.

¶54 We recognize and enforce a clear and unambiguous contract term, unless that term "violates public policy or is against good morals." *Youngblood v. Am. States Ins. Co.*, 262 Mont. 391, 395, 866 P.2d 203, 205 (1993). In *Youngblood*, we refused to enforce an unambiguous choice-of-law provision in an insurance contract that allowed subrogation of medical payments under Oregon law, concluding that the subrogation provision clearly violated Montana's established public policy. *Youngblood*, 262 Mont. at 400, 866 P.2d at 208. We expanded upon the *Youngblood* rule in *Casarotto v. Lombardi*, 268 Mont. 369, 886 P.2d 931 (1994), *rev'd on other grounds, Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 689, 116 S. Ct. 1652, 1657 (1996), and applied Restatement (Second) of Conflict of Laws §§ 187 and 188 to determine the validity of a choice-of-law provision that potentially violated Montana policy." *Casarotto*, 268 Mont. at 374-75, 886 P.2d at 934; *see Modroo*, ¶ 50 (explaining that *Casarotto* "expanded on" *Youngblood* and applied §§ 187 and 188).

¶55 In *Modroo*, we also reiterated our reliance on Restatement (Second) Conflict of Laws for determining "whether to give effect to parties' contractual choice-of-law provisions." *Modroo*, ¶ 53. Section 187 provides that we will apply the "law of the state chosen by the parties to govern their contractual rights" unless the following three factors, as restated by this Court, are met:

> (1) but for the choice of law provision, Montana law would apply under § 188 of the Restatement; (2) Montana has a materially greater interest in

24

the particular issue than the parties['] chosen state; and (3) application of the chosen state's law would contravene a Montana fundamental policy.

*Polzin v. Appleway Equip. Leasing, Inc.*, 2008 MT 300, ¶ 14, 345 Mont. 508, 191 P.3d 476 (citing Restatement (Second) of Conflict of Laws § 187(2)(b));[6] *see Tenas*, ¶ 34; *Modroo*, ¶ 54. All three conditions must be met. *Tenas*, ¶ 34. If a clear choice-of-law provision does not violate Montana public policy, there is no reason to analyze factors (1) and (2) under § 187(2)(b). *See San Diego Gas & Elec. Co. v. Ninth Judicial Dist. Court*, 2014 MT 191, ¶ 9, 375 Mont. 517, 329 P.3d 1264 (accepting a choice-of-law clause applying California law after finding "no reason that application of California law would contravene Montana's fundamental policy, regardless of the outcome of an analysis under factors (1) and (2)"); *c.f. Polzin*, ¶ 18 (concluding that the parties' choice of law was effective after determining that factor (1) was not met). In accordance with *Youngblood* and these subsequent cases, we will enforce a clear and unambiguous choice-of-law provision where it does not violate Montana public policy or "good morals." *Youngblood*, 262 Mont. at 395, 866 P.2d at 205; *Polzin*, ¶ 14.

¶56 In the District Court, Masters did not challenge the validity of the choice-of-law provisions set forth in the various contracts and agreements it negotiated with Comerica, and Masters never argued that the contracts were adhesive. In fact, Masters and Comerica negotiated these contracts and agreements containing choice-of-law provisions while at all times being represented by counsel. Masters cannot and does not argue that it

---

[6] We need not address the exception identified in § 187(2)(a), as it is neither argued nor applicable.

25

was coerced into executing a contract with a Michigan choice-of-law provision, nor (as noted above) can it contend that it was surprised that Comerica would urge application of Michigan law.

¶57 Masters did complain in the District Court that because Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing, enforcing the choice-of-law provisions would be contrary to Montana public policy. However, as Masters concedes, Michigan's Uniform Commercial Code does recognize that every commercial contract carries with it an obligation of good faith and fair dealing. *See* § 440.1304, MCL.[7] Although Michigan authority suggests that there is no stand-alone common law cause of action for breach of the implied covenant of good faith and fair dealing, *see, e.g.*, *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 279 (Mich. Ct. App. 2003), Michigan courts appear to apply the covenant when addressing the performance and enforcement of contracts in breach of contract cases, *see, e.g.*, *Wedding Belles v. SBC Ameritech Corp., Inc.*, No. 250103, 2005 Mich. App. LEXIS 286, at *3-4 (Mich. Ct. App. Feb. 8, 2005).[8] Thus, the covenant of good faith and fair dealing could have been considered by the jury in the context of Masters' claims for breach of contract, had the District Court applied Michigan law. Masters is therefore

---

[7] Section 440.1304, MCL, provides that "[e]very contract or duty within this act imposes an obligation of good faith in its performance and enforcement." *Compare* § 30-1-203, MCA ("Every contract or duty within this code imposes an obligation of good faith in its performance or enforcement.")

[8] *Wedding Belles* is an unpublished opinion and accordingly "is not precedentially binding under the rule of stare decisis" in Michigan courts. Mich. Ct. App. R. 7.215(c)(1). Regardless, the case's reasoning appears sound.

mistaken in its contention that enforcing the choice-of-law provisions would be contrary to Montana public policy.

¶58    We conclude that Masters and Comerica negotiated a clear and unambiguous choice-of-law provision that is neither against Montana public policy nor against public morals.    This being so, the District Court should have applied the contractual choice-of-law provision.    The District Court erred by refusing to apply Michigan law pursuant to the parties' agreement.    *See San Diego Gas & Elec. Co.*, ¶ 9 (concluding that a choice-of-law clause that did not "contravene Montana's fundamental policy" was valid, and that, therefore, the Court need not analyze the other § 187 factors).

*Scope of the Choice-of-Law Provision*

¶59    Having concluding that the parties' choice-of-law provision is effective, we next turn to the scope of the provision and whether it encompasses Masters' underlying tort claims.    In addition to its contract claims, Masters alleged constructive fraud, deceit, wrongful offset, and interference with and loss of prospective economic opportunity. Masters also requested punitive damages.    The Forbearance Agreement states that it "shall be governed and controlled in all respects by the laws of the State of Michigan, without reference to its conflict of law provisions, including interpretation, enforceability, validity and construction."[9]    Comerica argues that Masters' tort claims are contract-related and thus should be governed by the choice-of-law provision.    Masters counters that the provision covers only the "interpretation, enforceability, validity and

---

[9] In concluding that the Forbearance Agreement's enforceability was properly before the jury in ¶ 92, we use that instrument's choice-of-law provision in this analysis.

27

construction" of the contract. Masters therefore argues that the tort claims should be construed in accordance with Montana's general choice-of-law rules, specifically the "most significant relationship" test as relied upon by the District Court.

¶60 We face considerable challenges in addressing the parties' arguments. On appeal, the parties scarcely addressed the scope of the choice-of-law provision, which is understandable given word-number constraints and the number of issues involved in this appeal. Further, our case law provides little guidance for resolving this question. Given these circumstances and the peculiarities attendant to different cases with different contractual language, we decline to adopt a bright-line rule with respect to the scope of a choice-of-law provision. Instead, we will advance a view for purposes of deciding this case that "is best expressed in the law" for this situation. *Holmstrom v. Mut. Benefit Health & Accident Ass'n*, 139 Mont. 426, 430, 364 P.2d 1065, 1067 (1961) ("[W]here the case is of first import in this court, it should follow that view which it [concludes] is best expressed in the law.").[10]

¶61 The parties' choice-of-law provision clearly covers Masters' breach of contract claim and its claim of breach of the implied covenant of good faith and fair dealing. We conclude that the Forbearance Agreement's choice-of-law provision also should be read to encompass Masters' tort claims. Although the provision in this case arguably is

---

[10] This Court recognizes the divergent approaches taken by jurisdictions in construing choice-of-law provisions. State and federal courts have grappled with two pertinent questions that flow from giving effect to a choice-of-law provision: 1) which jurisdiction's law governs the scope of an effective choice-of-law provision; and 2) whether that same provision covers both contract and tort claims. *See, e.g.*, *Pyott-Boone Elecs. Inc. v. IRR Trust for Donald L. Fetterolf Dated Dec. 9, 1997*, 918 F. Supp. 2d 532, 541-46 (W.D. Va. 2013) (discussing cases).

"narrow," courts nonetheless have concluded that similar provisions cover tort claims arising out of a contract. *See Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 610-11 (6th Cir. 2001) (concluding that an agreement "governed by" Ohio law covered a promissory fraud claim as the "distinction between such a claim and a claim for breach of contract is so slight"); *Nw. Airlines v. Astraea Aviation Servs.*, 111 F.3d 1386, 1392 (8th Cir. 1997) (concluding that an agreement "governed by and interpreted" by Minnesota law provision covered claims for negligent performance, misrepresentation, deceptive trade practices, and unjust enrichment that raised "issues of performance and compensation for work done" under the agreement); *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1133, 1140 (6th Cir. 1991) (concluding that an agreement "governed by" Michigan law covered fraud and misrepresentation claims where party sought to "avoid enforcement of the contract"). *Cf. Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010) (concluding that a narrow choice-of-law provision did not reach claims that did not "arise out of the contract, involve the interpretation of any contract terms, or otherwise require there to be a contract"); *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 336 (2d Cir. 2005) (concluding that an agreement "governed by and construed in accordance with" New York law does not encompass setoff claim because it is "purely incident" and "arise[s] from outside the agreement").

¶62    It cannot reasonably be argued that Masters' tort claims are purely coincidental to or independent of its breach of contract claims against Comerica. Without the contracts that tied Masters and Comerica together, there would be no tort claims. It was

29

Comerica's handling of the contractual relationship between the parties and its unannounced sweep of Masters' accounts that prompted Masters' allegations of fraud and deceit. The torts clearly are related to the contracts; thus, under the foregoing authority, we conclude that Michigan law should have been applied to Masters' tort claims.

¶63    We are persuaded further by the context of this dispute that the choice-of-law provision encompasses Masters' tort claims arising from the contract. This case involves a large-scale financial transaction negotiated between two sophisticated and counselled entities that had an ongoing business relationship over two years. It is reasonable under these circumstances to infer that Masters and Comerica intended the choice-of-law provision to apply to all disputes arising out of their dealings. *Nedlloyd Lines B.V. v. Super. Court of San Mateo Cnty.*, 834 P.2d 1148, 1153 (Cal. 1992) ("When two sophisticated, commercial entities agree to a choice-of-law clause . . . the most reasonable interpretation of their actions is that they intended for the clause to apply to all causes of action arising from or related to their contract."); *see also Zaklit v. Global Linguist Solutions, LLC*, No. 1:14cv314, 2014 U.S. Dist. LEXIS 92623, at *34, (E.D. Va. July 8, 2014) ("The only reasonable inference is that the parties intended to provide for an efficient and businesslike resolution of possible future disputes by choosing a single forum and a single body of law to govern all claims, irrespective of where the events giving rise to those claims occurred."); *Pyott-Boone Elecs. Inc. v. IRR Trust for Donald L. Fetterolf Dated Dec. 9, 1997*, 918 F. Supp. 2d 532, 544 (W.D. Va. 2013) ("We seriously doubt that any rational businessperson, attempting to provide by contract for an

30

efficient and businesslike resolution of possible future disputes, would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship.") (citing *Nedlloyd*, 834 P.2d at 1154).[11]

¶64 For these reasons, we conclude that Michigan law should have governed all of Masters' claims pursuant to the Forbearance Agreement's effective choice-of-law provision.

*Application of Michigan Law to Masters' Claims*

¶65 We next turn to whether the application of Michigan law would have produced a different outcome had the jury been instructed under Michigan instead of Montana law. In order to do so, we examine whether there is an actual conflict between Michigan and Montana law with respect to the contract and tort claims.

*Masters' Contract Claims*

¶66 As both Michigan and Montana recognize a claim for breach of contract, we discern no conflict of law with regard to this claim. *Compare* § 600.5807, MCL (allowing damages for breach of contract), *with* § 27-1-311, MCA (permitting damages for breach of contract).

¶67 As to the alleged breach of the implied covenant of good faith and fair dealing, Montana law provides that "[e]very contract, regardless of type, contains an implied

---

[11] Notably, the agreements in *Nedlloyd*, *Zaklit*, and *Pyott-Boone* all contain choice-of-law provisions that are phrased similarly to the provision at issue in this case. *See Zaklit*, 2014 U.S. Dist. LEXIS 92623, * 8 ("This Agreement shall be governed by and interpreted under the laws of the Commonwealth of Virginia."); *Pyott-Boone*, 918 F. Supp. 2d at 537 ("This Agreement shall be governed by the laws of the State of Delaware without regard to any jurisdiction's conflicts of laws provisions."); *Nedlloyd*, 834 P.2d at 1150 ("This agreement shall be governed by and construed in accordance with Hong Kong law.").

covenant of good faith and fair dealing. A breach of the covenant is a breach of the contract. Thus, breach of an express contractual term is not a prerequisite to breach of the implied covenant." *McCoy v. First Citizens Bank*, 2006 MT 307, ¶ 21, 335 Mont. 1, 148 P.3d 677 (citation omitted). Section 28-1-211, MCA, specifies that "[t]he conduct required by the implied covenant of good faith and fair dealing is honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

¶68 In its complaint, Masters pleaded "Breach of Implied Covenant" as a separate count. However, within that count, Masters tied its claim directly to the alleged actions taken by Comerica in violation of the contract. The jury instruction proffered by the court on this issue stated:

> In every contract there is an implied obligation of good faith and fair dealing on the part of both parties which requires that neither party do anything unreasonable which deprives the other of the benefits of the contract. The conduct required is honesty in fact and the observation of reasonable commercial standards of fair dealing in the trade. Violation of this obligation is a breach of the contract. Masters contends Comerica breached this obligation.

As noted in ¶ 57, while Michigan law does not recognize an independent or stand-alone claim for breach of the implied covenant of good faith and fair dealing, *see Belle Isle Grill*, 666 N.W.2d at 279, it does recognize that the implied covenant applies to the performance of a contract, *see e.g.*, *Wedding Belles*, 2005 Mich. App. LEXIS 286, at *3 ("An implied covenant of good faith and fair dealing . . . applies to the performance and enforcement of contracts.") (citation omitted). Here, the jury was instructed that breach

of the covenant is a breach of contract. The same would hold true under either Montana or Michigan law.

*Masters' Tort Claims*

¶69    Comerica argues that had the District Court applied Michigan law, Masters' remaining claims of constructive fraud, deceit, and interference with and loss of prospective economic opportunity, would be precluded by Michigan's "economic loss doctrine," citing *Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612, 615 (Mich. 1992) (explaining that the economic loss doctrine provides that "[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only 'economic' losses") (internal quotation marks and citations omitted).

¶70    The rule in *Neibarger*, however, is not as broad as Comerica suggests. Michigan courts have not addressed the applicability of the economic loss doctrine to commercial loan transactions; rather, *Neibarger* and its progeny suggest that the doctrine is limited to cases involving the sale of goods. *See, e.g.*, *Neibarger*, 486 N.W.2d at 623 ("Since the damages sought in these cases are economic losses resulting from the *commercial sale of goods*, the plaintiffs' exclusive remedies are provided by the UCC") (emphasis added); *Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*, 656 N.W.2d 858, 862 (Mich. Ct. App. 2002) ("A factor present in all cases in which Michigan courts have applied the economic loss doctrine is that the parties to the litigation were involved, either directly or indirectly, *in a transaction for goods*.") (emphasis added); *Santander Consumer USA, Inc. v.*

33

*Superior Pontiac Buick GMC, Inc.*, No. 10-13181, 2013 U.S. Dist. LEXIS 25, at * 31 (E.D. Mich. Jan. 2, 2013) ("Defendant is correct that the phrase 'the economic loss doctrine' applies solely in U.C.C. cases."). We decline to interpret Michigan's economic loss doctrine as applying to the tort claims in this case.

¶71     However, the seminal Michigan case of *Hart v. Ludwig*, 79 N.W.2d 895 (Mich. 1956), is instructive in examining the propriety of tort claims that arise between parties within a contractual relationship. In *Hart*, the court explained that "if a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not." *Hart*, 347 Mich. at 565, 79 N.W.2d at 898 (quoting Prosser, Handbook of the Law of Torts § 33, at 205 (1st ed. 1941). The court continued:

> Before us, however, we have not such a case. We have simply the violation of a promise to perform the agreement. The only duty, other than that voluntarily assumed in the contract to which the defendant was subject, was his duty to perform his promise in a careful and skillful manner without risk of harm to others, the violation of which is not alleged. What we are left with is defendant's failure to complete his contracted-for performance. This is not a duty imposed by the law upon all, the violation of which gives rise to a tort action, but a duty arising out of the intentions of the parties themselves and owed only to those specific individuals to whom the promise runs. A tort action will not lie.

*Hart*, 79 N.W.2d at 898-99; *see also Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647, 658 (Mich. 1997) (explaining that "there is no cognizable cause of action in tort" because "there is no allegation that this conduct by the defendant constitutes tortious activity in that it caused physical harm to persons or tangible property; and plaintiff does not allege violation of an independent legal duty distinct from the duties arising out of the contractual relationship.").

34

¶72 Although the Michigan Supreme Court recognizes that "[t]he question whether an action in tort may arise out of a contractual promise has not been without difficulty," *Rinaldo's*, 559 N.W.2d at 657, "the threshold inquiry is whether the plaintiff alleges violation of a legal duty *separate and distinct* from the contractual obligation," *Rinaldo's*, 559 N.W.2d at 658 (emphasis added).

¶73 Here, Masters finds support for its constructive fraud claim in (1) Comerica's allegedly misleading promises about being "'flexible' as to collateral and that it was interested in the relationship with Masters, not just treating the loan as a transaction;" (2) Comerica's alleged misrepresentation as to the borrowing base in advising Masters of what collateral would be considered in the borrowing formula; and (3) Comerica's sweeping of the accounts in contravention of its own policies. These allegations stem directly from the parties' contractual relationship. In other words, Masters does not identify a "legal duty separate and distinct from the contractual obligation," *Rinaldo's*, 559 N.W.2d at 658, but rather "simply [a] violation of [Comerica's] promise to perform the agreement," *Hart*, 79 N.W.2d at 898. Under these circumstances, the tort of constructive fraud "will not lie" as an independent tort under Michigan law. *Hart*, 79 N.W.2d at 899.

¶74 Although Michigan, like Montana, arguably recognizes a claim of intentional interference with prospective economic advantage, *compare Badiee v. Brighton Area Sch.*, 695 N.W.2d 521, 538 (Mich. Ct. App. 2005) (setting forth the elements of tortious interference with a business relationship or expectancy), *with Maloney v. Home & Inv.*

35

*Ctr., Inc.*, 2000 MT 34, ¶ 41, 298 Mont. 213, 994 P.2d 1124 (2000) (setting forth the elements of intentional inference with prospective economic advantage), the principles outlined in *Hart* and subsequent cases still control. Again, Masters has not set forth a "separate and distinct" duty arising independently of the contract that provides an avenue for recovery in tort. Therefore, this claim likewise "will not lie" under Michigan law. *See Hart*, 79 N.W.2d at 899.

¶75 As to the deceit claim, the parties concede that Michigan does not recognize a civil claim for deceit.[12] We therefore conclude that this tort claim is not cognizable under Michigan law.

¶76 We also must address the tort claims against Comerica that the Guarantors assigned to Masters. Guarantors were not named as plaintiffs in this action. Instead, they assigned their claims against Comerica to Masters. Guarantors' testimonies at trial revealed clearly that these claims were personal in nature. Neither Montana nor Michigan law permits the assignment of a personal injury cause of action to a third party. *See Youngblood*, 866 P.2d at 206 ("[A] cause of action growing out of a personal right, such as a tort, is not assignable."); *Jones v. Hicks*, 100 N.W.2d 243, 246 (Mich. 1960) (explaining "that a right of action for fraud is personal and not assignable"); *Joos v. Drillock*, 338 N.W.2d 736, 739 (Mich. Ct. App. 1983) (explaining that because of the "personal nature of the attorney-client relationship and . . . public policy considerations . . . a legal malpractice cause of action is not subject to assignment"). Therefore, Masters

---

[12] In Masters' Motion for Partial Summary Judgment, Masters admitted that it "cannot locate any Michigan statute comparable to" § 27-1-712, MCA, Montana's deceit statute.

could not pursue damages based on Guarantors' assignment of their tort claims against Comerica.

¶77 In sum, we conclude that had the District Court applied Michigan law, Masters' tort claims of constructive fraud, intentional interference with prospective economic advantage, and deceit would not have been permitted to go to the jury as stand-alone tort claims. The District Court therefore erred in allowing these claims to go to the jury. The additional conclusion follows that we must vacate the jury's award of $10.5 million in punitive damages. After the tort claims leave, the only claims remaining are contractual in nature. Contract claims do not provide an avenue for punitive damages. *See* § 27-1-220(2), MCA; *Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 55 (Mich. 1980) ("[E]xemplary damages are recoverable as compensation to the plaintiff, not as punishment of the defendant."). The Michigan Supreme Court stated in *Gilbert v. DaimlerChrysler Corp.*, 685 N.W.2d 391 (Mich. 2004) that "courts must be mindful of the fact that punitive damages are available in Michigan *only* when expressly authorized by the Legislature." *Gilbert*, 685 N.W.2d at 400 (emphasis in original). Punitive damages for breach of contract are not authorized by any Michigan statute. We therefore vacate the punitive damages award.

¶78 Given our disposition of Masters' tort claims and the punitive damages award under Michigan law, we do not reach whether (as briefed by the parties) the District Court erred in refusing to dismiss tort claims based upon statutes of limitation, or erred by invalidating Montana's cap on punitive damages.

37

¶79    *Issue 3: Whether the District Court erred in not deciding issues of contract formation as a matter of law.*

¶80    Masters alleged that Comerica breached the Forbearance Agreement and the implied covenant of good faith and fair dealing when it swept Masters' and Guarantors' accounts without notice at the end of December 2008, when the Forbearance Agreement pledged forbearance until February 16, 2009. Comerica sought summary judgment that because the Forbearance Agreement was not fully executed, it did not qualify as a binding contract. Comerica argued that whether the agreement constituted a contract was a purely legal question for pretrial resolution by the court. The District Court rejected this argument and denied Comerica's request for summary judgment. Comerica argues on appeal that this was error. Masters counters that it was appropriate for a jury to decide whether the conditions of the Forbearance Agreement had been met or had been waived by virtue of Comerica's conduct and correspondence with Masters.

¶81    Waiver is "a voluntary and intentional relinquishment of a known right, claim or privilege which may be proved by express declarations or by a *course of acts and conduct so as to induce the belief that the intention and purpose was to waive.*" *Idaho Asphalt Supply v. State*, 1999 MT 291, ¶ 19, 297 Mont. 66, 991 P.2d 434 (emphasis added); *see Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003) (explaining that "a waiver is a voluntary and intentional abandonment of a known right" that may be evinced by conduct). We have relied on *Williston on Contracts* stating:

In a basic sense, the concept of 'waiver' as an excuse for nonperformance is an equitable doctrine, designed to prevent the waiving party from lulling another into a belief that strict compliance with a contractual duty will not be required, and then either suing for noncompliance or demanding compliance for the purpose of avoiding the transaction.

*Lewistown Miller Constr. Co. v. Martin*, 2011 MT 325, ¶ 21,363 Mont. 208, 271 P.3d 48

(quoting Samuel Williston & Richard A. Lord, 13 *Williston on Contracts* § 39.15, at 564

(4th ed. 2000).

¶82    Comerica relies on the proposition that "if a condition precedent to formation is not fulfilled, then there is no agreement and the contract is not binding," citing *Thompson v. Lithia Chrysler Jeep Dodge of Great Falls*, 2008 MT 175, ¶ 22, 343 Mont. 392, 185 P.3d 332.  However, the events that followed the December 17 forbearance offer call into question whether Comerica waived the requirement of strict compliance with the conditions precedent to the Forbearance Agreement.

¶83    By December 17, 2008, Masters had provided Comerica with a modified term sheet from Wells Fargo contemplating a $13 million alternative financing option. Comerica's December 17 offer to forbear stated, "Subject to timely, written acceptance by [Masters] and Guarantors of the following conditions, [Comerica] is willing to forbear until February 16, 2009."  The conditions of performance included that Masters, Vlahos, and Pratt would come up with certain specified sums by certain specified dates.  The offers set a deadline of "no later than 12:00 (noon) on December 19, 2008" for Masters, Vlahos, and Pratt to sign and hand deliver the Forbearance Agreement to Comerica.  As the record reflects, Masters was the only party that signed the agreement by the specified

December 19 deadline. However, Comerica did not receive Masters' signed copy until three days later, on December 22, via e-mail. In his e-mail to Comerica, Masters' Chief Executive Curtis Howell also indicated that Masters had "forwarded [the Forbearance Agreement] to Larry Pratt and Michael Vlahos to sign and return." Karl Norton, Comerica's Vice President, responded with an e-mail the same day stating, "Thanks. Look forward to the rest of the signatures." Pratt ultimately signed the Forbearance Agreement on December 21, 2008, two days after the specified signature date.

¶84 Despite the late signatures by Masters and Pratt, and the lack of a signature from Vlahos—who was out of the country and unavailable, as Comerica was aware—Masters and its guarantors began performing the conditions of the Forbearance Agreement, and Comerica began accepting those performances. Pratt transferred stock accounts in the form of cash into a Comerica bank account, raising his personal guarantee funds to more than $8 million. In order to meet his required $9 million guarantee, Pratt anticipated transferring additional hedge fund proceeds into the Comerica account—funds that Comerica knew would not be available until January 2009. Per its calculations, Comerica estimated that Pratt's guarantee would still have a $60,000 shortfall. In response, Pratt wired that amount into the Comerica account in December to make up for the expected shortfall.

¶85 On December 24, 2008, Comerica, through its attorneys, sent Vlahos a letter requesting that he review and execute "the Security Agreement required by Comerica in connection with the Masters Group Forbearance Agreement" and return the document by

December 29, 2008. Comerica was aware, however, that Vlahos would be unavailable until January 2, 2009, as he was out of the country.

¶86 By December 29, 2008, Comerica had coordinated with Vlahos's Wachovia Security account in order to commence the liquidation of Vlahos's securities, contemplating an initial transfer of $475,000 with an additional $25,000 forthcoming, as required by the Forbearance Agreement. In the ensuing days, Comerica sent additional entitlement orders instructing Wachovia Securities to transfer Vlahos's assets into the Comerica account.

¶87 On December 30, 2008, at 10:52 a.m., Greg Yaklin, Masters' Vice President of Finance, indicated in an internal e-mail that Comerica required Vlahos to sign the Forbearance Agreement by "today [December 30] or they would not forbear any longer. This in addition to all the other [sic] being resolved by tomorrow [December 31]." That same morning, at 10:57 a.m., Masters contacted Comerica stating that it had not received the documents that needed Vlahos's signature. Comerica responded by stating, "[w]e need the attached security agreement signed and the Forbearance signed. As far as Dr. Vlahos's Wachovia account, this letter will be forthcoming and does not require his signature. Although it will require him to fax something to his Wachovia broker." In this correspondence, Comerica gave no indication that Vlahos's signature was an urgent matter or that it intended to execute an offset the following day, December 31, 2008.

¶88 Summary judgment is "an extreme remedy and should never be substituted for trial if a material factual controversy exists." *Tonner v. Cirian*, 2012 MT 314, ¶ 9, 367

Mont. 487, 291 P.3d 1182 (quoting *Contreras v. Fitzgerald*, 2002 MT 208, ¶ 23, 311 Mont. 257, 54 P.3d 983). In determining whether a material factual controversy exists, we consider all evidence in the light most favorable to the non-moving party. *Malpeli v. State*, 2012 MT 181, ¶ 12, 366 Mont. 69, 285 P.2d 509.

¶89    Comerica knew that Vlahos was unavailable to sign the Forbearance Agreement (a supposed precondition to formation of the contract) until the new year, yet—with the deadline to receive that signature already having passed—coordinated with Masters and the guarantors to accept their performance under the Forbearance Agreement. When viewed in a light most favorable to Masters, Comerica's conduct provided a triable dispute about whether it waived the Forbearance Agreement's clause stating the preconditions to contract formation. Under similar circumstances, we have determined that when a question regarding waiver of contractual rights is presented, "[i]t is for the trier of fact to determine whether an act is voluntary and the actor's intent." *Mont. Mining Props., Inc. v. ASARCO*, 270 Mont. 458, 466, 893 P.2d 325, 330.[13] In this connection, we note that Comerica suggested to the District Court regarding jury instructions that "[i]t's better argued to the jury about whether or not there was a contract."

¶90    In concluding that Comerica was entitled to summary judgment on the issue of contract formation, Justice Rice's dissent on this issue rests primarily on e-mails sent

---

[13] Justice Rice suggests differentiating between waiver of conditions to contract formation and waiver of conditions to contract performance. Concurrence and Dissent, ¶ 116. We do not opine on this distinction because, as Justice Rice acknowledges, Comerica did not argue it either before the trial court or on appeal.

internally within Masters between November 2008 and January 2009. Concurrence and Dissent, ¶¶ 122-30. In support of its motion for summary judgment, Comerica attached eighty exhibits comprising three, two-inch-thick bindings of paper. With little exception, the e-mails that Justice Rice references are not among these exhibits. Most of the e-mails referenced by Justice Rice are contained in trial exhibits that were not before the District Court when Comerica moved for summary judgment. A motion for summary judgment turns on the evidence in the record at the time of the motion. M. R. Civ. P. 56(c)(3); *Wright v. State*, 231 Mont. 324, 327, 752 P.2d 748, 750 (1988).

¶91 Applying Michigan law to the waiver question results in the same outcome as applying Montana law. In *Quality Prods.*, the Michigan Supreme Court addressed those circumstances under which a contract provision may be waived or modified, stating that "parties to a contract are free to mutually waive or modify their contract," 666 N.W.2d at 253 (emphasis removed), and that "a course of affirmative conduct, particularly when coupled with oral or written representations, can amount to a waiver," 666 N.W.2d at 261. Notably, the Michigan Supreme Court has stated that "the definition of a waiver is a question of law, but whether the facts of a particular case constitute a waiver is a question of fact." *Sweebe v. Sweebe*, 712 N.W.2d 708, 711 (Mich. 2006). When viewed in a light most favorable to Masters, Comerica's course of conduct following the supposed December 19 deadline to perform conditions precedent to the Forbearance Agreement provided a reasonable basis for a jury to determine that question of fact in favor of Masters.

¶92     Comerica argues, however, that implied waivers are precluded by the Forbearance Agreement's provision stating that "absent an express written waiver by Bank, Bank will not be bound" unless an agreement is "reduced to writing and signed by Borrower and Guarantors and Bank." We disagree. The presence in a contract of a "no implied waiver" provision will not necessarily defeat a waiver-by-conduct argument. *Formall, Inc. v. Cmty. Nat'l Bank of Pontiac*, 360 N.W.2d 902, 905 (Mich. Ct. App. 1984) ("[A]n 'anti-waiver' clause, like any other term in the contract, is itself subject to waiver or modification by course of performance and . . . whether such waiver or modification has occurred is a question for the factfinder.") (citation omitted). *Williston on Contracts* explains,

> The general view is that a party to a written contract can waive a provision of that contract by conduct despite the existence of a so-called antiwaiver or failure to enforce clause in the contract. . . . This general rule, that a party to a written contract may waive a provision despite the existence of an antiwaiver or failure to enforce clause, is based on the view that the nonwaiver provision itself, like any other term in the contract, is subject to waiver by agreement or conduct during performance.

13 Richard A. Lord, *Williston on Contracts* § 39:36, at 715-16 (4th ed. 2013) (internal footnotes omitted). Thus, the law of both Montana and Michigan supports the District Court's decision to submit the companion questions of contract formation and waiver to the jury.

¶93     Comerica also argues that summary judgment was appropriate on Masters' alleged breach of the implied covenant of good faith and fair dealing. Since we already found in ¶ 73 that the covenant of good faith and fair dealing could have been considered by the

44

jury in the context of Masters' claims for breach of contract under Michigan law, we do not address this issue further.

¶94 *Issue 4: Whether the District Court abused its discretion by allowing TARP evidence to be presented to the jury.*

¶95 Masters first referenced Comerica's receipt of TARP funds in its Answer and Third-Party Complaint. According to Masters, Comerica told Masters that those particular funds "could not be used in connection with existing borrowers" like Masters. Comerica initially requested a protective order to preclude any TARP-related discovery because there is no private right of action against it for declining to extend TARP funds to Masters as a troubled borrower. Comerica then filed a motion in limine to exclude any evidence relating to TARP on the grounds that it was prejudicial, irrelevant to Masters' claims, invited confusion, and that a private cause of action under TARP does not exist. In response, Masters argued that TARP evidence was relevant to Comerica's alleged misrepresentations as well as to its underlying claims of deceit, constructive fraud, and breach of implied covenant of good faith and fair dealing.

¶96 In its December 24, 2013 Order, the District Court concluded that evidence regarding TARP funds was relevant as to whether Comerica lied about the availability of those funds. Although it agreed not to entertain a private cause of action, the District Court permitted Masters to "carefully present[]" TARP evidence in order to address specifically Masters' claims of deceit, constructive fraud, and breach of implied covenant of good faith and fair dealing, and to support its claim for punitive damages. Comerica

subsequently raised the issue again in its Rule 50 and 59 motions, which the District Court also denied.

¶97 On appeal, Comerica again disputes the relevance of TARP funds and argues that Masters elicited TARP testimony to lead the jury to believe that Comerica had an obligation to loan TARP funds to Masters. Comerica argues that this evidence was unfairly prejudicial and tended to provoke the "jury's 'instinct to punish.'"

¶98 To determine whether the District Court properly admitted the TARP evidence, we first examine whether the evidence was relevant. "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M. R. Evid. 401. Irrelevant evidence is inadmissible. M. R. Evid. 402.

¶99 The facts that are of consequence to Masters' breach of contract and implied covenant of good faith and fair dealing claims are those facts concerning the existence of a contract to forbear and whether Comerica breached that contract. TARP evidence does not bear on the existence of these facts. It is undisputed that Comerica was under no obligation to extend TARP funds to Masters, and that TARP does not provide a private right of action. *See, e.g.*, *Hart v. Countrywide Home Loans, Inc.*, 735 F. Supp. 2d 741, 748 (E.D. Mich. 2010) ("There is no express or implied right to sue fund recipients . . . under TARP.") (citation omitted). In analyzing Comerica's ostensible misrepresentations regarding the purpose of TARP funds, Masters cites *Morrow v. Bank of Am., N.A.*, 2014 MT 117, 375 Mont. 38, 324 P.3d 1167, for the proposition that evidence concerning

46

TARP is relevant whether or not there is a private right of action. Masters' reliance on *Morrow* is misplaced. *Morrow* involved an alleged oral modification of a home loan serviced by a bank through a federal program known as the Home Affordable Modification Program (HAMP). *Morrow*, ¶ 10. Although this Court recognized that HAMP, like TARP, "does not provide for a private cause of action," *Morrow*, ¶ 39, HAMP in fact formed the basis of the alleged loan modification between the Morrows and the bank, *Morrow*, ¶¶ 10-11.

¶100 In this case, however, there was no similar connection between TARP and the Masters-Comerica relationship. The availability of TARP funds does not make the existence of a contract to forbear or the breach of that contract any more or less probable. Masters' claim of breach of contract (and the included claim of breach of the implied covenant of good faith and fair dealing) relied on a contract to forbear, not on a contract to extend funds—TARP or otherwise. We thus conclude that the TARP evidence was irrelevant and that, by permitting its introduction, the District Court abused its discretion.

¶101 When a District Court abuses its discretion by permitting the introduction of evidence that should have been barred, we must determine whether the error is reversible. Reversible error occurs when "the impact of clearly inadmissible evidence is conceivably outcome-determinative." If so, "the only appropriate course is reversal." *Boude*, ¶ 21. For instance, in *Boude*, we reversed a jury verdict because we could not determine how much of an impact the irrelevant evidence had on the jury. "The test of prejudicial error requiring reversal is whether there is a reasonable possibility the inadmissible evidence

47

might have contributed to the verdict." *Boude*, ¶ 21 (quoting *Pacificorp v. Dep't of Revenue*, 254 Mont. 387, 398, 838 P.2d 914, 920 (1992)).

¶102 At trial, Masters' witnesses tied the lack of TARP assistance directly to the claim that Comerica improperly swept the accounts and did not treat Masters fairly. Chris Schrichte, one of Masters' founders and directors, testified that he felt Masters was "being singled out because of the quality of the collateral that we had put up." If Masters' collateral was worth less, the Bank "probably would have worked with us to work the situation out," as it did with other distressed borrowers in the "Workout Group." After the accounts were swept, Schrichte called Ernie Zarb, Karl Norton's boss, and asked Zarb directly whether the TARP funds were available to help businesses like Masters. Zarb said no and told Schrichte that Comerica would not return the money that had been swept from the accounts. Schrichte testified that this conduct of Comerica "shut the company down."

¶103 The most effective and damning testimony against Comerica on this point came from Neil Barofsky, the former TARP Special Inspector General who told the jury he was charging Masters $10,000 per day for trial time. Barofsky advised the jury that the U.S. Government invested a "couple hundred billion dollars in taxpayer money" to essentially buy stock in large financial institutions so that those institutions could turn around and lend money to the public. Barofsky testified that "the heart and the core" of TARP's Capital Purchase Program was to enable banks to make loans to new and existing customers. Consistent with that goal, he told the jury, Comerica agreed to

expand the flow of credit and told the government that it planned to use the funds in small business and middle market groups (in which Masters was included). But Comerica later advised Barofsky's office that it did not end up making those loans as intended, partly because of lack of borrower demand.

¶104 Barofsky told the jury that nothing in the TARP program or other banking regulations required a sweep of Masters' accounts and that there was "no reason" that Comerica could not have used TARP funds to provide assistance to Masters. In the final analysis, Barofsky opined, although TARP succeeded in some areas, including "saving the banks and making the banks profitable," it fell far short in its goals of helping "Main Street," including "small businesses that were trying to make payroll" and "small start-ups, like Masters, who were trying to get the financing necessary."

¶105 Masters also presented evidence tying the TARP funds to Comerica's failure to include Masters in the Bank's Special Handling Group for distressed accounts. The Special Handling Group was announced publicly in December 2008. Michael Sheehan, a Comerica bank officer who testified by video deposition, told the jury that accounts put in the Special Handling Group had a ninety-eight percent success rate by the time the Group was closed in 2010. He confirmed that if Comerica had not seized Masters' assets, Masters would have been a candidate for the Special Handling Group. Barofsky testified that TARP funds could have been used to assist Masters had Comerica included Masters in its Special Handling Group "[b]ecause the TARP funds were available to Comerica with very, very few restrictions."

¶106 The fact that all witnesses acknowledged that Masters could not sue Comerica directly under TARP does not make this evidence harmless. If anything, it bolsters Comerica's prejudice argument. With no remedy available under TARP, Masters had no other recourse against the Bank for its allegedly unfair conduct. This is aptly demonstrated by Masters' closing argument. Counsel for Masters argued that Comerica had "no need" to sweep the accounts and had broken its promise about renewing the note, when it knew that Masters never would have been able to pay the loan off in two years' time. He argued that Comerica had failed to take into account what its customer needed:

> They could have taken the TARP money, the 2.25 billion dollars that they got to help their customers and actually apply it to one of their customers that was in trouble. Instead, all they've really been able to tell you [is] we didn't use it for that . . . . [W]hat we did is we loaned it to another financial institution and they maybe used it to loan some money to some of their customers. But that's not what they told the government and their shareholders and that's not what the TARP funds were to be used for. And Neil Barofsky . . . [t]his is a guy that was appointed by the president, approved by Congress, and he comes to Butte, Montana and . . . he sat here and he said these funds were for that purpose and there was nothing other than that purpose they should be used for.

¶107 In light of the manner in which the TARP evidence was presented and argued, we are compelled to conclude that there is "a reasonable possibility the inadmissible evidence might have contributed to the verdict." *Boude*, ¶ 21. Our determination on the prejudicial effect of the TARP evidence requires a new trial. Therefore, we do not proceed to consider whether (as briefed by the parties) the District Court erred by using a general verdict form or abused its discretion in other evidentiary rulings. We also do not

consider Comerica's claims that neither the evidence nor the jury instructions were adequate to support the jury's award for lost profits and consequential damages.

## CONCLUSION

¶108  We reverse the judgment against Comerica and remand for a new trial on the contract claims, applying Michigan law, in accordance with this opinion.

¶109  This opinion does not affect the judgment in favor of BLDC against Masters.


/S/ BETH BAKER

We concur:

/S/ JAMES JEREMIAH SHEA


Justice James Jeremiah Shea, concurring.

¶110  The one issue upon which this Court unanimously agrees is that the District Court erred by allowing the jury to consider the TARP evidence.  From that unanimous premise, the opinions diverge as to whether or not the erroneous admission of the TARP evidence compels reversal and remand.  Justice Cotter, joined by Chief Justice McGrath and Justice Wheat, concludes that the admission of the TARP evidence does not warrant a new trial.  Concurrence and Dissent, ¶ 134.  Based on my review of the record in this matter, I am compelled to conclude otherwise.  I therefore concur with the majority on this issue.

¶111  Justice Cotter concludes reversal is not required because although the TARP evidence should not have been admitted, "The District Court instructed the jury on the

law in the case, and none of the instructions invited the jury to consider TARP evidence and/or award damages as a result of the failure to extend TARP funds," and "We presume the jury follows the law." Concurrence and Dissent, ¶ 139. However, though we may presume the jury follows the law, we have nevertheless repeatedly recognized that some evidence is so prejudicial as to raise the specter of a reasonable possibility that the inadmissible evidence might have contributed to the verdict. *Martin v. BNSF Ry. Co.*, 2015 MT 167, ¶ 33, ___Mont.___, ___P.3d___; *Boude*, ¶ 21; *Pacificorp*, 254 Mont. at 398, 838 P.2d at 920. In such cases, we have determined that the only appropriate course is reversal.

¶112 I likewise cannot agree with Justice Cotter's conclusion that "any potential harm predicated upon admission of the TARP evidence would be eliminated by virtue of [our] reversal of the more elastic awards of consequential and punitive damages." Concurrence and Dissent, ¶ 140. In previous cases where we have found evidence so prejudicial as to warrant reversal, we have done so even when the inadmissible evidence pertained only to an issue of damages that was never reached by the jury because the verdict was rendered solely on the issue of liability. In so holding, "we recognized 'that such evidence can have an impact upon a jury's verdict on the issue of liability, as well as damages.'" *Martin*, ¶ 33 (quoting *Mickelson v. Mont. Rail Link, Inc.*, 2000 MT 111, ¶ 46, 299 Mont. 348, 999 P.2d 985). Comerica's liability in this case was hotly contested and far from clear. Indeed, Justice Rice, joined by Justice McKinnon, concluded that Comerica was entitled to judgment as a matter of law and would hold that the entire

52

matter should not have gone to the jury. Concurrence and Dissent, ¶ 114. While I disagree with this conclusion, it illustrates the point that the issue of liability—including liability for the economic damages I would otherwise be inclined to uphold—was by no means a foregone conclusion.

¶113 Finally, Justice Cotter observes that there was substantial evidence placed before the jury to support its verdict for Masters' economic losses. Concurrence and Dissent, ¶ 144. While I agree with this observation, I cannot agree with the reasoning that the admission of the TARP evidence was therefore insufficient to compel a retrial. Concurrence and Dissent, ¶ 144. In *Boude*, we similarly observed that there was substantial evidence to support the jury's verdict on liability. Nevertheless, we reversed the jury's verdict because we correctly observed: "Where the impact of clearly inadmissible evidence is conceivably outcome-determinative, we conclude the only appropriate course is reversal." *Boude*, ¶ 21. In this case, there is no dispute that the TARP evidence was inadmissible. Viewing the record in its entirety, I must conclude that the impact of this evidence was, at a minimum, conceivably outcome-determinative. Therefore, I must conclude that the only appropriate course is reversal and remand.

/S/ JAMES JEREMIAH SHEA

Justice Rice, concurring in part and dissenting in part.

> "It is getting close to being out of time for this. . . . There is certainly no more moving the Bank and I was quite surprised they gave us until 12/29."
>
> > –Internal email from Gregory Yaklin
> > Vice Pres., Masters Group International
> > December 17, 2008
> > 9:55 p.m.

¶114 I believe the District Court erred by failing to enter summary judgment in favor of Comerica on the issue of contract formation, and that, on this record, the issue was not one for the jury to decide. In my view, the Court has improperly analyzed the issue by failing to consider all of the uncontested evidence, place the transaction in the correct factual context, and properly apply the standards of summary judgment. I would reverse for entry of judgment in favor of Comerica, under either Montana or Michigan law, as the governing contractual principles are applicable in either jurisdiction.

¶115 Comerica moved for summary judgment, demonstrating that the prerequisites for entering the Forbearance Agreement, under which the Bank would forbear until February 16, 2009, had not all been satisfied. In response, Masters asserted that Comerica had waived the prerequisites for forming or entering the Forbearance Agreement, and that the jury should decide that question. To meet its responsive burden, Masters had to "set forth specific facts, not merely denials, speculation, or conclusory statements, in order to establish that a genuine issue of material fact does indeed exist." *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶ 39, 345 Mont.12, 192 P.3d 186 (citing M. R. Civ. P. 56(e)). If no genuine issues of material fact exist, then the court must determine

54

whether the facts "entitle the moving party to judgment as a matter of law." *Lorang*, ¶ 39.

¶116 First, it should be noted that there is a distinction between conditions of contract formation and conditions of contract performance. *See Thompson v. Lithia Chrysler Jeep Dodge of Great Falls*, 2008 MT 175, ¶ 22, 343 Mont. 392, 185 P.3d 332 ("[I]f a condition precedent to formation is not fulfilled, then there is no agreement and the contract is not binding. This is distinguished from a condition precedent to performance of a contract obligation, which assumes the contract was formed."). In *Thompson*, an arbitration case, the qualitative difference in these conditions determined whether the court or an arbitrator was to decide the issue. *Thompson*, ¶ 23. All of the contract waiver authority cited by the Court addresses waiver of conditions of contract performance, not contract formation. Opinion, ¶¶ 81, 91-92. There is authority for the proposition that the law of waiver does not apply to prerequisites of contract formation, because contractual duties cannot arise until formation has occurred. The formation of a contract "marks the border between the law of offer and acceptance, which relates to the formation stage, and the law of conditions, which relates to the performance stage. . . . [T]he law of conditions includes the concept of waiver, while that of offer and acceptance does not." II E. Alan Farnsworth, *Farnsworth on Contracts*, § 8.2, 396 n.13 (2d ed. 1998). *See also* Restatement (Second) of Contracts § 224 cmt. c (1979) (contractual conditions are limited to "a duty under an *existing* contract," as opposed to a prerequisite to contract formation, the latter which is excluded from the definition of a "condition."). (Emphasis

55

added.) Nonetheless, because this case was not argued or tried based on this distinction, I will assume herein that the prerequisites stated by Comerica were conditions that were subject to waiver. However, given that contract formation is precedent to contractual duty, our standard that "waiver is mainly a question of intention and must be manifested in some *unequivocal manner*," becomes even more critical here. *Paulson v. Flathead Conservation Dist.*, 2004 MT 136, ¶ 39, 321 Mont. 364, 91 P.3d 569 (citing *Thiel v. Johnson*, 219 Mont. 271, 275, 711 P.2d 829, 832 (1985)).

¶117 *Paulson* also instructs that the unequivocal manifestation of waiver can be founded "upon *express* written statements, oral *express* statements or acts or conduct which induce the belief that *the intention and purpose* is to waive." *Paulson*, ¶ 39. (Emphasis added.) The evidence here, when viewed in total and in factual context, convinces me that Comerica did not unequivocally waive the prerequisites to formation or execution of the Forbearance Agreement by express statements or by conduct that induced a belief that the intention and purpose was to waive. In fact, if anything was unequivocal, it was that Comerica would not waive any of the prerequisites. And Masters' internal communications—both before and after the sweep of funds—showed that it understood exactly that.

¶118 Although the Court sets forth some factual background, it decides this issue after a brief discussion and primarily on a generic reference to the record evidence, that Comerica's conduct throughout this financial transaction was enough to defeat summary judgment. Opinion, ¶ 89. I believe this shortchanges the evidence and fails to emphasize

important facts that establish the full context of the transaction, including Masters' clear understanding of Comerica's intentions.

¶119 It should first be understood that this was a major transaction, involving international commerce, international banking, millions of dollars and sophisticated parties with legal counsel. This was not a transaction between a rural hometown bank and a local business, where the parties' conduct and informal dealings over time may have established expectations based upon those patterns. Here, the formal pattern was set from the beginning of the transaction: careful documentation was prepared and required for every aspect of the transaction. These facts, like those mentioned below, are uncontested.

¶120 The due date on the initial two-year, $9 million loan was July 11, 2008. Masters borrowed additional sums two times prior to this due date, but at each step of the transaction, Comerica made it clear in writing that the additional advancement of funds constituted neither a "waiver of any defaults" or of any of Comerica's "rights and remedies," nor a commitment to forbearance. Masters defaulted by failing to pay the loan by the due date, and Comerica notified Masters that it would not renew the loan, advising Masters to seek alternative financing. Comerica did, however, offer to extend the due date of the loan until November to give Masters time to obtain new financing, and advanced another $500,000 to Masters, over another written provision, agreed to by Masters, that these actions did not waive any of Comerica's rights and remedies under the initial loan agreement.

57

¶121 The economy slowed, reducing the values of the securities provided by Masters' guarantors, and placing Masters in default under the loan agreement for that reason. Further, they failed to obtain new financing and defaulted on the extended November due date. Comerica advised Masters in writing on November 25 that it was forbearing only day to day, and that if the loan was not paid in full by December 5, 2008, it would exercise its remedies—explaining again that its failure to act immediately was not a waiver or modification of its right to do so. Then, Comerica went further, explaining that it anticipated that future discussions about Masters' debt would be undertaken, but if so, Comerica would not be bound unless an agreement was "reached on all issues," the agreement was reduced to writing, and signed by Masters, Masters' guarantors, and Comerica.

¶122 Here, Comerica was not only advising that it was preserving its rights, but also taking the extra precaution—prescient, as it turned out—of protecting itself against claims of waiver for engaging Masters further about Masters' debt, making it clear that it would not be bound unless any understanding was reduced to writing and signed by all parties, including by Masters' guarantors. Comerica took care to ensure that the rules for future discussions, as well as the status of the matter, were made very clear. As a sophisticated borrower, Masters knew all of this full well. In an internal email dated November 20, Masters' Brian McNamara advised:

> [T]he time of reckoning is drawing very close. . . . We must communicate (IN PERSON) in certain and unequivocal terms to our investors/lenders that their guarantees will most likely be called and converted to cash by Comerica after month end. . . . We owe it to them to insure that they

understand the situation completely and will not be surprised if Comerica pulls the trigger.

Further, Masters' Cashflow Report of November 24 confirmed that "Masters is not able to cover interest and payroll, among other commitments, due over the next few days which will also trigger a default to Comerica. If the default is executed, guarantors' assets will be seized and Masters accounts in the US will be frozen, which will effectively close the US business."

¶123 The Court's supposition that Comerica's conduct throughout this financial transaction suggests an intention by Comerica to "lull" Masters into a belief that strict compliance would not be required is, in my view, starkly antagonistic to the record, as will be further noted herein. Opinion, ¶¶ 81-82. The rules governing the parties' relationship demonstrated from the beginning the necessity of compliance, including written and signed confirmation, and these requirements were well understood by all parties.

¶124 December 5th came without payment by Masters. In discussions with Masters, Comerica continued to forbear only day to day. Masters' Gregory Yaklin was in contact with Comerica, and emailed internally as follows on December 5th:

> Comerica has agreed to forbear today. They have also agreed to send us a term sheet specifying what items they need to see us achieve as well as the required timing to continue to forbear. *If we can continue to comply with the forbearance terms, they will forbear through January 31. . . . Comerica is not saying they will blankly forbear until 1/31. It is just that Comerica has agreed to define for us the terms on which they will continue to forbear* because we have not really accomplished anything concrete at this point.

¶125   On December 17, Comerica delivered, as promised, a written offer setting forth the terms under which it would continue to forbear, known in this litigation as the Forbearance Agreement.  Comerica reserved its rights and remedies and stated that it would not be bound until there was a written agreement on all issues.  The Comerica conditions were, in summary, liquidation of sufficient of the guarantors' securities to secure the loan and deposit of funds to pay interest and bank fees by December 29, and signatures by all parties, including Masters' guarantors, by December 19.  Comerica emphasized, as it had before, that "absent any express written waiver by Bank, Bank will not be bound by an agreement on any individual issues unless and until an agreement is reached . . . reduced to writing and signed by Company and Guarantors and Bank."  As noted in the quote at the beginning of this dissent, Masters' Yaklin then expressed that, although the time in which Masters was to accomplish these things was short, Comerica had given Masters an unexpectedly generous timeframe, stating "[t]here is certainly no more moving the Bank and I was quite surprised they gave us until 12/29."  Masters was not being lulled.  Rather, they knew full well:  *There is no more moving the Bank."*

¶126   Thereafter, Masters and its guarantors fulfilled some of the conditions, but not all, failing to complete several signature and financial requirements.  Masters signed the Agreement by December 19 and returned it, whereupon a Comerica representative told Masters on December 22 that he was looking forward to the rest of the signatures.  On December 24, Comerica's counsel mailed a letter to guarantor Vlahos that he must execute the required security agreement by December 29.  This was not done.  On

60

December 29, Masters' Curtis Howell said in an internal email that Vlahos was "on a small island somewhere off the coast of Palm Beach" and would be delayed until after January 1st. On December 30, Yaklin internally emailed that Comerica "told me that the signed forbearance agreement was required to be received from Dr[.] Vlahos today or they would not forbear any longer. This is in addition to all the other being resolved by tomorrow."

¶127 The facts specifically cited by the Court in drawing the suggestion that Comerica's conduct was lulling Masters along, and in affirming the denial of summary judgment, largely focus on Comerica's acceptance of signatures after December 19, and Comerica's knowledge that Vlahos was out of the country. Opinion, ¶¶ 85, 89. But there was never any indication from Comerica that it would delay the requirements of the Forbearance Agreement until Vlahos finished his vacation, or that it was willing to allow further time to satisfy the remaining financial conditions. To the contrary, Comerica requested the signature on December 17, December 24, and December 30 (demanding it "today" or it would cease to forbear). In fact, on December 30, Comerica contacted Masters, reported the signature had not been received, and said "we need" the documents signed by Vlahos. The Court states that Comerica "gave no indication that Vlahos's signature was an urgent matter," Opinion, ¶ 87, but the evidence is to the contrary. Comerica made repeated requests for the signature until December 30, when Comerica stated that the signature was needed "today" or Comerica would cease forbearing. This was urgent.

¶128 Context here is important. These are sophisticated parties in a sophisticated transaction. Masters was already in default. Comerica was forbearing only day to day. Comerica could exercise its rights at any time and, as provided by carefully prepared documents, it would not waive that right except by express written agreement and upon completion of the conditions of forbearance. Most importantly, Masters knew <u>all</u> of this. They were under no illusions. The Court cites work done by both sides toward completion of the Agreement, but in the end, multiple of Masters' obligations were not satisfied. Partial performance of conditions under a legal framework that requires full performance does not constitute waiver of unsatisfied conditions. As explained by *Williston on Contracts*, "when the parties to a proposed contract have agreed that the contract is not to be effective or binding until certain conditions are performed or occur, no binding contract will arise until the conditions specified have occurred or been performed." 13 Richard A. Lord, *Williston on Contracts* § 38:7, 439 (4th ed. 2013). Our holding in *A.T. Klemens & Son v. Reber Plumbing & Heating Co.*, 139 Mont. 115, 119, 360 P.2d 1005, 1007 (1961), is also apropos: "Where parties to a contract verbally agree upon all of its terms but stipulate that it will not be binding until it is reduced to writing, it is not binding upon the parties until it is reduced to writing and signed."

¶129 There was no evidence Masters was lulled by Comerica—quite the opposite, Masters' internal communications demonstrate they knew Comerica could act on its default any day. Comerica made repeated demands, but they were not fulfilled. Finally, on December 30, Comerica told Masters it could not forbear any longer, and swept the

accounts the next day. In contrast to the "hard" evidence that documents Comerica's action, Masters' allegations of being misled are "speculation, or conclusory statements" that are without basis in the record and insufficient to defeat summary judgment. *Lorang*, ¶ 39. There is no evidence here that Comerica "unequivocally" waived the conditions, gave an "express" written or oral statement of waiver and, I submit, conveyed by conduct that its "intention and purpose" was to waive the conditions. *Paulson*, ¶ 39.

¶130 This was further illustrated by what occurred after Comerica swept the accounts. Masters' communications reflected its understanding that it had simply failed to satisfy the conditions. Masters' Howell emailed Comerica on December 31, stating:

> [T]he only remaining contingency is that our investors require waiting until early next week on the approval of the other $500,000 investor fusion by Letter of Credit before they commit the initial $350,000. We even have the funds to pay the majority of the outstanding interest. . . . All of the other funds and their availability should be resolved next week.

In short, even beyond the failure to obtain Vlahos's signature, Masters still needed more time to make arrangements to meet the financial conditions, offering only that they had enough money to pay "the majority" of the outstanding interest, and that another week "should" resolve the problems with the other sums that were required. On January 3, 2009, Howell emailed the Masters' board of directors:

> Comerica had wanted all paperwork signed and cash deposited in Masters [sic] account at the bank by Dec 29. . . . [T]his was not able to be completed by the 29th and we had communicated with Comerica that we were able to pay all interest due through 12/31. . . . We felt this would be acceptable but on the afternoon of Dec 30 they called us to say that they had decided this would not be acceptable and they were going to foreclose on the loan.

Clearly, everyone knew the score.

¶131   This was not a jury question.  The cited evidence is of record and uncontested. While Masters undoubtedly preferred to have the jury decide the question of contract formation, "the existence of a contract is ordinarily a question of law," and when there are no issues of material fact for a jury to resolve, the question is appropriately resolved by summary judgment.  *Sayler v. Mont. Dep't of Labor & Indus.*, 2014 MT 255A, ¶ 17, 376 Mont. 369, 336 P.3d 358 (citing *Chipman v. Nw. Healthcare Corp.*, 2014 MT 15, ¶ 12, 373 Mont. 360, 317 P.3d 182).  Comerica is entitled to judgment as a matter of law.

¶132   The Court's decision makes it practically difficult for commercial banks to work with a commercial borrower in a default position, such as Masters', without running a high risk of subjecting itself to a waiver argument.  This is not the situation we analyzed in *Morrow v. Bank of Am., N.A.*, 2014 MT 117, 375 Mont. 38, 324 P.3d 1167, where there was evidence of repeated assurances of relief from the lender to the borrower. Rather, Comerica handled this transaction with formality, putting the terms in writing and stating clearly it was not waiving its rights.  What remains is the question of what more Comerica should have done to ensure that, by attempting to work reasonably with Masters by making concessions, it could secure its position without subjecting itself to liability in the event Masters could not satisfy the conditions.  As we have noted, "[c]ommercial stability requires that parties to a contract may rely upon its express terms without worrying that the law will allow the other party to change the terms of the agreement at a later date."  *Baker v. Bailey*, 240 Mont. 139, 143, 782 P.2d 1286, 1288

(1989). That is particularly true in a sophisticated transaction, where documentation of every aspect has been prepared and communicated. Therefore, I would reverse for entry of judgment in favor of Comerica.[1]

¶133 However, given the fact that there are not four votes for the position espoused by this dissent, I also join Issue 4 of Justice Baker's opinion. Apart from the issue of contract formation, I agree that the admission of the TARP evidence was prejudicial trial error and therefore concur in reversing the judgment and remanding the matter for a new trial.

/S/ JIM RICE

Justice Laurie McKinnon joins in the concurring and dissenting Opinion of Justice Rice.

/S/ LAURIE McKINNON

---

[1] The Court responds to this dissenting opinion with the assertion that some of the documents relied upon herein were not presented to the District Court with the summary judgment motion. Opinion, ¶ 90. The Court's criticism assumes that the District Court reviewed the documents submitted by Comerica, of which there is no indication in the record. The court's cursory order denying the motion for summary judgment cited none of Comerica's documents and specifically identified none of the material factual issues that the court said prevented summary judgment, reasoning merely that "[o]f all the documents that *can be considered*, the Court finds that Comerica failed to establish an absence of a genuine issue of material fact." (Emphasis added.) More importantly, the Court fails to consider the entire record. Comerica raised the summary judgment motion again at trial, in conjunction with a motion for judgment as a matter of law, arguing that summary dismissal of the claim was still appropriate. At that point the documents, more than merely submitted to the court, had been entered into evidence.

Justice Cotter, concurring in part and dissenting in part.

¶134   I concur with the majority opinion's conclusions through ¶ 93.  However, I dissent from the Court's decision to remand this matter for a new trial based on the District Court's decision to admit the TARP evidence.  Consequentially, I would reach the remaining issues presented by the parties concerning the District Court's rulings on evidence and the general verdict form, and I would affirm in part and reverse in part.

¶135   Although I agree that the District Court abused its discretion in allowing the jury to consider the TARP evidence, Opinion, ¶ 100, I cannot agree with the majority's assertion that the "prejudicial effect of the TARP evidence requires a new trial." Opinion, ¶ 107.  In concluding that the admission of TARP evidence compels a reversal, the majority selectively blends evidence concerning an internal Comerica Special Handling Group with the wholly unrelated availability of TARP funds so as to create a picture that the evidence did not actually paint.  Opinion, ¶ 105.

¶136   As the majority notes, the formation of a special handling group was announced by Comerica in December 2008.  Comerica vice-president Sheehan testified that this group would be handling accounts that were undergoing various levels of financial distress.  Both Sheehan and Comerica President Michael Ritchie told the jury that this special handling group commenced operations in the first quarter of 2009, which was shortly after the Masters' accounts were swept.  Sheehan testified that this group could have been of assistance to Masters had its assets not already been seized.

¶137 The fact that the Bank decided in 2008 to form this special handling group was clearly admissible to demonstrate that at the time it was announcing plans to assist other troubled customers, it was moving to liquidate Masters' assets. Neither party argued that TARP money had any bearing on the Bank's decision to sweep Masters' accounts or its contemporaneous plans to come to the aid of other distressed Comerica borrowers. The Special Handling Group and TARP were simply not related.

¶138 As the District Court found when denying the Bank's post-trial motions, Masters did not claim entitlement to the TARP funds, nor did it contend that Comerica was obligated to extend them. Moreover, in response to inquiries from Masters and Comerica, Barofsky categorically concluded that Comerica used TARP funds appropriately. He testified:

> [Masters] Q. In your opinion, could Comerica have used TARP funds to assist Masters in 2008?
>
> [Barofsky] A. If they had chosen to, they could have.
>
> [Masters] Q. Was it required?
>
> [Barofsky] A. It was not required.
>
> [Masters] Q. Was it prohibited?
>
> [Barofsky] A. It was not prohibited.
>
> .   .   .
>
> [Comerica] Q. And banks such as Comerica that received TARP funds had broad discretion on how they could use those funds, right?
>
> [Barofsky] A. Yes, very broad.

.  .  .

> [Comerica] Q. And there's nothing inappropriate about the way Comerica handled the money, right?

> [Barofsky] A. No. . . . no, there's absolutely nothing inappropriate.

Comerica also elicited testimony from its own witness Ritchie, who stated that Comerica "invested most of the TARP funds back into mortgage backed securities, which again was part of the design of the program" and explained that Comerica never specifically applied TARP funds to "any specific individual customer" like Masters. Comerica reiterated on closing argument, citing to Barofsky's testimony, that "the bank was under no obligation to use that money for individual loans such as Masters" and that Barofsky had agreed that the funds were used squarely within the purposes of TARP. Notably, Masters did not argue to the contrary. In voir dire and again during opening statements, counsel told the jury very clearly that it was not claiming that Comerica was under an obligation to lend TARP money to Masters.

¶139 The District Court instructed the jury on the law in the case, and none of the instructions invited the jury to consider TARP evidence and/or award damages as a result of the failure to extend TARP funds. Further, witnesses for both parties concurred that there was no private cause of action under TARP. We presume the jury follows the law. *See State v. Hagen*, 2002 MT 190, ¶ 50, 311 Mont. 117, 53 P.3d 885.

¶140 Finally, although the Court concludes at ¶ 107 that there is a reasonable possibility that the TARP evidence contributed to the verdict, it does not suggest in what particulars the verdict might have been tainted. I submit that Comerica has not established how it

68

was harmed by the admission of the evidence. As explained below, while I and those joining this dissent would uphold the jury's award of principal and interest and lost profits, we would vacate the award of punitive damages as well as the award of consequential damages. Of the damages awarded, it was these awards that could have been susceptible to inflation should the jury have harbored an instinct to punish Comerica for not extending TARP funds to Masters. By contrast, the remaining awards of the jury were calculated to the dollar upon the losses to which lay and expert witnesses testified. I therefore submit that any potential harm predicated upon admission of the TARP evidence would be eliminated by virtue of reversal of the more elastic awards of consequential and punitive damages.

¶141 I therefore believe that the court overstates the impact of the TARP evidence and arguments. I also disagree with the majority's melding of the TARP evidence with evidence concerning the Bank's Special Handling Group, and its conclusion that it was the TARP evidence that was "conceivably outcome-determinative" of the jury's conclusion that Comerica failed to act in good faith in its dealings with Masters.

¶142 In sum, I would conclude that the District Court abused its discretion when it allowed TARP evidence to be presented to the jury, but conclude that the error was harmless as Comerica has not carried its burden of proving prejudice. *See Rocky Mt. Enters. v. Pierce Flooring*, 286 Mont. 282, 294, 951 P.2d 1326, 1333 (1997) ("No civil case shall be reversed by reason of error which would have no significant impact upon the result. Where there is no showing of substantial injustice, the error is harmless and

69

may not be used to defeat the judgment."). As a consequence, I would reach the other issues presented by the parties and would affirm the District Court's remaining decisions concerning its evidentiary rulings and use of the general verdict form.

¶143 I would uphold the jury's $5,433,910 award for "Principal and interest on funds wrongfully offset" and the $19,603,683 award for "Lost profits or other future gain," which were premised upon "hard evidence" of actual damages supported by substantial expert and lay testimony. I would vacate the award of $16,500,000 in consequential damages because it stemmed wholly from the brief testimony of two guarantors who complained about the emotional impact of having their accounts swept. The award is unsupported in the record, there was no jury instruction defining or differentiating between consequential and other damages, and under both Montana and Michigan law, the Guarantors could not lawfully assign their personal injury claims to Masters. I would also vacate the punitive damages award because the stand-alone tort claims should not have been presented to the jury, and there can be no award of punitive damages stemming from the breach of contract claims.

¶144 This was a hard-fought case. While some mistakes were made, there was substantial evidence placed before the jury to support its verdict for breach of contract and the covenant of good faith and fair dealing and for the awards entered for Masters' economic losses. I believe the Court errs in concluding that the admission of the TARP evidence is sufficient to wipe out that verdict and compel a retrial of this complicated matter. I therefore strongly dissent from the Court's reversal and remand for new trial.

70

/S/ PATRICIA COTTER


Chief Justice Mike McGrath and Justice Michael E Wheat join in the concurring and dissenting Opinion of Justice Cotter.


/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT